### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 8:07CR101 |
| Plaintiff, ) | |
| ) | |
| vs. ) | REPORT AND |
| ) | |
| CHARLES CRICK, ) | RECOMMENDATION |
| ) | |
| Defendant. ) | |

This matter is before the court on the motion to suppress filed by defendant Charles Crick (Crick) (Filing No. 10). Crick is charged in the Indictment with the possession with the intent to distribute more than 100 kilograms of marijuana (Count I) in violation of 21 U.S.C. § 841(a)(1) and (b)(1), and criminal forfeitures (Count II) in accordance with 21 U.S.C. § 853.

Crick seeks to suppress evidence obtained January 27, 2007, as the result of a traffic stop and the subsequent search of Crick's trailer by officers of the Omaha Police Department (OPD). Crick filed a brief in support of the motion on May 3, 2007 (Filing No. 11). The United States has not filed a brief in opposition of the motion. Crick denies he committed the traffic infraction of "failing to maintain a lane of traffic." Crick argues the initial traffic stop, his detention, both initially and after being given a warning, and a warrantless search of his trailer were violations of the rights afforded to Crick under the Fourth Amendment of the United States Constitution, because they were conducted without legal justification.

The court held a hearing on the motion May 29, 2007. Crick was present at the hearing and was represented by retained attorney J. William Gallup. The United States was represented by Assistant United States Attorney Nancy A. Svoboda. The court heard the testimony of OPD Officer Jeffery Vaughn (Officer Vaughn). The court received into evidence Officer Vaughn's certificate of his completion of K-9 training with his dog Ela (Exhibit 1), a copy of Neb. Rev. Stat. § 60-6,139 (Exhibit 2), and photographs of packages allegedly containing marijuana (Exhibit 102). A transcript (TR.) of the May 29, 2007 hearing was filed June 5, 2007 (Filing No. 29), at which time the matter was deemed submitted.

## FINDINGS OF FACT

In September 2002 Officer Vaughn joined the OPD and was assigned to the uniform patrol unit (TR. 4-5). Officer Vaughn continued in his position until May 2006, when he was reassigned to the OPD K-9 unit (TR. 5). Officer Vaughn underwent training in association with his assignment in the K-9 unit, at which time Officer Vaughn first met Ela, a Belgium Malinois dog trained in the detection of narcotics (TR. 5-7). Officer Vaughn and Ela were paired together during the training, and after 10-12 weeks Officer Vaughn and Ela completed their training and moved on to the certification process (TR. 6-7). The certification process includes a test in which Officer Vaughn and Ela together must meet certain minimum standards in order to become certified (TR. 7-8). Officer Vaughn and Ela passed certification in July 2006, and became certified in the State of Nebraska as trained in the Nebraska Police Service Dog Standards. (TR. 8; Exhibit 1). In addition to the initial training, Officer Vaughn and Ela underwent monthly training every month since July 2006 (TR. 9-10). Ela is specifically trained in identifying the odors of methamphetamine, cocaine, marijuana and heroin (TR. 10).

Dogs trained in the detection of narcotics can exhibit to their handler that narcotics are present in two different ways, by alerting or indicating (TR. 11). An alert occurs when the dog sniffs heavily in the direction of the odor of narcotics, in an attempt to pinpoint the exact source of the odor (TR. 11). Indicating is a police service dog's trained way to indicate the presence of narcotics (TR. 11-12). Indications can occur in one of two ways, the dog can aggressively indicate by biting, barking, or scratching, or the dog can passively indicate by staring in the direction of the odor (TR. 12). Ela is an aggressive indication dog (TR. 12).

On the night of January 27, 2007, Officer Vaughn was headed eastbound in the middle lane on Interstate 80 near 42nd St. in Omaha, Nebraska (TR. 13-14). Officer Vaughn was driving directly behind a pickup truck pulling a recreational type trailer (TR. 13). Officer Vaughn observed the rear right tire of the trailer drift about twelve inches into the lane the truck and trailer were previously in for 200 feet and for three to five seconds (TR. 14, 53). After Officer Vaughn observed the trailer drift into the adjacent lane, Officer Vaughn activated his overhead lights and directed Crick to move the truck and trailer to the

side of the road (TR. 14-15).  The vehicles came to a stop on Interstate 80 near 32nd St. where Officer Vaughn exited his police vehicle and approached the truck on the passenger side (TR. 17).

When Officer Vaughn arrived at the passenger side window, Officer Vaughn asked Crick for a driver's license, proof of insurance, and registration for the truck and the trailer (TR. 17).  Crick was able to produce his driver's license, proof of insurance, and registration for the trailer, but could not locate the registration for the truck (TR. 18).  At that time, Officer Vaughn asked Crick to step out of the truck and follow Officer Vaughn to the back of the trailer (TR. 19).  Crick indicated he would, rolled up the window, but did not exit the truck (TR. 20).  Crick continued to search for the registration to the truck for 20 seconds, at which point Officer Vaughn repeated his request to have Crick follow him to the back of the trailer, and this time Crick complied with Officer Vaughn's request (TR. 20, 21).  When Crick and Officer Vaughn arrived at the back of Crick's trailer, Officer Vaughn thought it was too loud to talk to Crick on the roadside and asked Crick to have a seat in the police vehicle, which Crick did (TR. 21-22).  Officer Vaughn had a seat in the driver's seat of the police vehicle (TR. 21-22).

Officer Vaughn noticed that upon entering the police vehicle, Crick became extremely nervous (TR. 24).  Throughout the time Crick was inside the police vehicle, Officer Vaughn observed Crick breathing heavily, rubbing the back of his neck, and shifting very frequently to the point that Crick was right up against the door (TR. 26).  Officer Vaughn characterized Crick's level of nervousness as being much more nervous than normal (TR. 25, 26).

At this time Officer Vaughn asked Crick where Crick was coming from (TR. 26). Crick told Officer Vaughn he was coming from Trinidad, Colorado (TR. 27).  Officer Vaughn asked Crick if he had been anywhere before that, and Crick said he had previously been in Tuscon, Arizona (TR. 27).  This struck Officer Vaughn as significant because Officer Vaughn believed Arizona to be a source state for drugs (TR. 27).  Officer Vaughn asked Crick the purpose for his trip to Tuscon (TR. 27).  Crick took a deep breath, exhaled, and paused for five to seven seconds before responding that he did not know (TR. 27).  Officer

3

Vaughn asked Crick to repeat himself to make sure Officer Vaughn heard Crick correctly, and Crick responded again that he did not know (TR. 28).

A short time later Crick said he owned a business that deals in jewelry, and the reason he was in Tuscon was to make contacts for his business at a rock show. Rock is an industry term used to mean jewelry (TR. 28, 63). Officer Vaughn asked Crick the name of the rock show, and Crick said he did not know (TR. 28). Crick added that the rock show did not begin until the day that the traffic stop was taking place (TR. 28). Officer Vaughn asked Crick why he did not attend the rock show, if that was the reason for his trip to Tuscon (TR. 29). Crick responded he did not want to disturb the vendors as they set up their tables (TR. 29). Officer Vaughn did not understand Crick's answer so Officer Vaughn asked Crick to answer again (TR. 29). Crick responded again that he did not want to disturb the vendors as they set up their displays for the show (TR. 29, 30).

Officer Vaughn asked Crick why Crick had taken the trailer with him to Arizona (TR. 30). Crick paused for several seconds and responded that he did not know (TR. 30). Officer Vaughn believed Crick was trying to come up with an answer, but when Crick was unable to come up with an answer he would say that he didn't know (TR. 30). Officer Vaughn ran a data check on Crick's driver's license, proof of insurance, and registration for the trailer, and the data check revealed that everything was in order (TR. 30, 31). At this point, Officer Vaughn called for backup, then wrote Crick a warning ticket for failure to maintain a lane (TR. 31, 79-80). While he was writing the warning ticket, Officer Vaughn asked Crick where he stayed in Tuscon (TR. 31). Crick stated he stayed in a motel (TR. 31). Officer Vaughn asked Crick the name of that motel, and Crick responded he did not know despite staying there for a week (TR. 31-32). Officer Vaughn gave Crick the warning ticket, and told Crick he was free to go (TR. 32).

After being told that he was free to go, Crick remained in the passenger seat of the police vehicle and did not move, so Officer Vaughn asked Crick if Officer Vaughn could ask a few more questions (TR. 32). Crick replied yes, and Officer Vaughn said that part of his duties as a police officer was to look for people involved in the transportation of illegal items, such as drugs (TR. 32). Officer Vaughn asked Crick if Crick had anything illegal in the truck (TR. 33). Crick leaned forward, put his hands in his lap, stared straight ahead,

and said no (TR. 33). Officer Vaughn asked if Crick had any weapons inside the truck, and Crick said no (TR. 33). Officer Vaughn asked Crick if he had any marijuana, methamphetamine, cocaine, or heroin in the truck, and to each substance Crick answered no (TR. 33). Officer Vaughn asked Crick if Officer Vaughn could search the truck and trailer (TR. 33, 34). In response to this question, Crick replied, "No, I want to go," (TR. 34). Crick reached for the door, grabbed and pulled the handle to the door (TR. 34). At that point, Officer Vaughn told Crick to "hang on one sec", and continued by saying he (Officer Vaughn) was going to run his police dog, Ela, around the vehicle (TR. 34). Officer Vaughn told Crick that Crick had said some things that led Officer Vaughn to believe Crick was involved in criminal activity (TR. 34).

By this time the backup Officer Vaughn requested had arrived (TR. 34). Officer Vaughn told one of the officers who had arrived to stand next to Crick near the passenger door of the police vehicle, and Officer Vaughn began to take Ela around Crick's truck and trailer (TR. 35, 36). At the front passenger side of the truck, Officer Vaughn gave Ela the command to sniff for the odor of narcotics (TR. 37, 39). Ela and Officer Vaughn walked from the front passenger side of the truck to the front driver side, and continued down the driver side of the truck towards the trailer (TR. 37, 39). When Ela reached the driver side rear wheel well of the truck, Ela alerted to the odor of narcotics by sniffing heavily the air (TR. 37-39). Ela took Officer Vaughn to the front driver side of the trailer, and there Ela alerted to the odor of narcotics (TR. 38, 39). At this point Officer Vaughn took Ela back to the rear driver side wheel well and again gave Ela the command to sniff for the odor of narcotics (TR. 40). Ela alerted again on the rear wheel well, and again took Officer Vaughn to the front driver side of the trailer, and this time indicated by scratching with both paws at the side of the trailer (TR. 40).

Officer Vaughn went back to the police vehicle and asked Crick if there was any reason that Ela would indicate for the odor of narcotics on the trailer (TR. 41). To this, Crick hunched over and said no (TR. 41). Officer Vaughn asked Crick if he had the keys to the locks on the trailer, and Crick said nothing (TR. 41). Officer Vaughn told Crick that if Crick did not tell Officer Vaughn where the keys to the trailer were, the officers would use bolt cutters to cut the locks (TR. 41). After Officer Vaughn said this, Crick indicated the

5

keys were in the center console of the truck (TR. 41). Officer Vaughn and the other officers retrieved the keys and opened the trailer (TR. 42). Immediately upon opening the trailer Officer Vaughn could smell the odor of raw marijuana, and upon going inside the trailer Officer Vaughn observed four large black and gray boxes (TR. 42). Officer Vaughn proceeded to open one of the boxes, in which he found several packages covered in a blue-green cellophane material roughly two feet wide by three feet long by anywhere from three to ten inches high, from which a stronger odor of raw marijuana was detected (TR. 42, 43, 80; Exhibit 102).

One of the officers who had arrived as backup took Crick into custody, and another drove the truck and trailer to the OPD impound lot (TR. 43). Officer Vaughn notified his sergeant of Crick's arrest and the seizure of the truck and trailer (TR. 43). Shortly thereafter, Officer Vaughn drove the police vehicle to the OPD impound lot, where Officer Vaughn, along with other OPD officers, conducted a thorough search of the truck and trailer (TR. 43). In the trailer, the officers found 64 packages inside four large boxes containing 1208 pounds of raw marijuana (TR. 44). In addition, the officers found a small quantity of coffee grounds placed inside of socks, and a piece of paper that appeared to be an inventory of the packages contained inside the trailer (TR. 44).

## CONCLUSION OF LAW

### A.   Traffic Stop

Crick argues a police officer does not have probable cause to initiate a traffic stop when a car drifts 3-12 inches out of its lane for three to five seconds. The Eighth Circuit has "repeatedly held that any traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver." **United States v. Mallari**, 334 F.3d 765, 766 (8th Cir. 2003) (internal quotation and citations omitted). In addition, if an "officer is legally authorized to stop the driver, any additional 'underlying intent or motivation' does not invalidate the stop." **United States v. Bloomfield**, 40 F.3d 910, 915 (8th Cir. 1994) (en banc) (**citing United States v. Cummings**, 920 F.2d 498, 501 (8th Cir. 1990)).

"To determine whether a traffic stop was based on probable cause or was merely pretextual, an 'objective reasonableness' standard is applied." **United States v. Jones**,

275 F.3d 673, 680 (8th Cir. 2001). An officer has an objectively reasonable basis for stopping a motorist where the officer has a reasonable basis for believing the driver has breached a traffic law. **See *Mallari***, 334 F.3d at 766 (**citing *United States v. Thomas***, 93 F.3d 479, 485 (8th Cir. 1996); ***United States v. Sanders***, 196 F.3d 910, 913 (8th Cir. 1999)) (officer's mistaken, but objectively reasonable belief that a traffic violation occurred supported traffic stop).

The government cites Neb. Rev. Stat. § 60-6,139(1), as the basis for which Officer Vaughn initiated their traffic stop of Crick's vehicle. The statute provides:

> Whenever any roadway has been divided into two or more clearly marked lanes for traffic, . . . A vehicle shall be driven as nearly as practicable within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety;

Neb. Rev. Stat. § 60-6,139(1) (2006).

Because Officer Vaughn observed the rear right tires of Crick's trailer temporarily drift into a different lane, Crick, had failed to stay in a single lane. Because the record provides no reason why Crick would have temporarily drifted into another lane, there was no practicable reason for the rear right tires of Crick's trailer to temporarily drift into a different lane. Crick failed to produce any evidence that would contradict these findings. Therefore, since the right rear tire of Crick's trailer temporarily drifted into another lane, and there was no practicable reason for the trailer to do so, Crick's operation of the truck and trailer on January 27, 2007 was a violation of section 60-6,139(1), and provided Officer Vaughn with probable cause to stop Crick's vehicles. Furthermore, because Officer Vaughn observed the rear right tires of the trailer drift into another lane, Officer Vaughn had an objectively reasonable belief that Crick had violated section 60-6,139.

### B.     Detention Of Crick In Officer Vaughn's Police Vehicle

Contemporaneous with a valid traffic stop, a police officer may detain the motorist while completing a number of routine tasks such as computerized checks of the vehicle registration, driver's license and criminal history, and issuing a citation. ***United States v. $404,905.00,*** 182 F.3d 643, 647 (8th Cir. 1999). An officer may conduct a investigation

"reasonably related in scope to the circumstances that justified the interference in the first place." ***Cummings***, 920 F.2d at 502. This reasonable investigation includes a request by the officer that the driver sit in the patrol car. ***United States v. Brown***, 345 F.3d 574, 578 (8th Cir. 2003).

Once Officer Vaughn initiated a traffic stop of Crick's truck and trailer, Officer Vaughn was permitted to conduct an investigation related to what Officer Vaughn believed was a violation of Neb. Rev. Stat. § 60-6,139. As part of this investigation, Officer Vaughn could request that Crick sit with Officer Vaughn in the police vehicle while Officer Vaughn completed computerized checks of Crick's license, proof of automobile insurance, and proof of automobile registration.

### C.     Officer Vaughn's Detention of Crick Against Crick's Will

Crick contends Officer Vaughn did not have sufficient probable cause or reasonable suspicion to detain a motorist, when the motorist fails to produce a license, appears much more nervous than the average motorist stopped by a police officer, and gives strange answers to question posed to him by the officer.

The record shows Officer Vaughn wrote Crick a warning ticket for his failure to maintain a single lane of traffic, and told Crick he was free to go. At this point Crick must have known, despite evidence that he was "slow", that any further time he spent inside the police vehicle was voluntary on his part. Crick demonstrated his knowledge of the consensual nature of his encounter with Officer Vaughn when in response to Officer Vaughn request to search the vehicle, Crick told Officer Vaughn "No, I want to go." Once Crick expressed his desire to leave to Officer Vaughn, the encounter between Crick and Officer Vaughn was no longer consensual. When Officer Vaughn told Crick to "hang on one sec," a reasonable person would no longer believe that it was optional for them to comply with the officer's request. At this point Officer Vaughn had detained Crick, and the encounter took on the character of an investigatory detention.

"Stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the [Fourth and Fourteenth] Amendments, even though the purpose of the stop is limited and the resulting detention quite brief." ***Delaware v. Prouse***, 440 U.S. 648, 653

(1979).  "An investigative stop of a vehicle does not violate the Fourth Amendment where the police have a reasonable suspicion that the occupant of the vehicle is engaged in criminal activity."  ***United States v. Briley***, 319 F.3d 360, 364 (8th Cir. 2003).

In ***United States v. Beck***, 140 F.3d 1129, the Eighth Circuit stated:

> The standard of articulable justification required by the fourth amendment for an investigative, ***Terry***-type seizure is whether the police officers were aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warranted suspicion that a crime was being committed.  In assessing whether the requisite degree of suspicion exists, we must determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion.  The totality of the circumstances -- the whole picture -- must be taken into account.  We may consider any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals.  It is not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to an interpretation of guilt, however, the officers must be acting on facts directly relating to the suspect or the suspect's conduct and not just on a "hunch" or on circumstances which describe a very broad category of predominantly innocent [people].

***United States v. Beck***, 140 F.3d 1129, 1136 (8th Cir. 1998) (internal citations and quotations omitted); **see also** ***Illinois v. Wardlow***, 528 U.S. 119, 123-24 (2000).  Additionally, courts have held evasive and erratic behavior can contribute to a finding of reasonable suspicion.  ***United States v. Turpin***, 920 F.2d 1377, 1385 (8th Cir. 1990) (suspect exhibited erratic behavior and "alarm" after seeing police officers); ***United States v. Montero-Camargo***, 208 F.3d 1122, 1136-37 (9th Cir. 2000) (suspect took evasive and erratic path in an apparent attempt to avoid police, which was relevant to reasonable suspicion analysis).  Furthermore, the Supreme Court has held "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."  ***Wardlow***, 528 U.S. at 124.

The nature of Crick's encounter with Officer Vaughn became that of an investigatory detention at the time Officer Vaughn told Crick to "Hang on one sec."  Officer Vaughn was aware at that time of particularized, objective facts that taken together with rational

9

inferences drawn from those facts, would create a reasonable suspicion that Crick was involved in criminal activity. Based on the record, Officer Vaughn was aware that Crick had just gone to Tuscon, Arizona. Officer Vaughn was aware Crick had responded that he did not know why he went to Tuscon, before telling Officer Vaughn he (Crick) went there to make contacts for his business at a rock show. Officer Vaughn was aware that Crick had represented that, although the purpose for his trip was to make contacts for his business, Crick nevertheless did not attempt to make contacts once he arrived in Tuscon, and even left the area before the show began. Further, Officer Vaughn knew that Crick could not recall the name of the motel he stayed at while in Tuscon for a week. Officer Vaughn was knew Crick was breathing very heavily, frequently rubbing the back of his neck, and frequently shifting his body while in the police vehicle. Officer Vaughn observed that Crick was acting much more nervously in the police vehicle than the average person  Officer Vaughn observed that Crick had paused for several seconds before answering many of the questions Officer Vaughn had asked Crick during the encounter, including direct questions pertaining to the existence of illegal drugs inside Crick's truck and trailer.

Based on the "particularized, objective facts" which Officer Vaughn was aware of at the time he told Crick to "hold on one sec," Officer Vaughn could have rationally inferred a reasonable suspicion that Crick was involved in criminal activity. The facts known to Officer Vaughn at that time show that Officer Vaughn was not acting upon a mere hunch, but rather acting upon facts that directly related to Crick's conduct. In addition, courts have held several times that nervous, erratic, and evasive behavior is a pertinent factor in determining if a reasonable suspicion of criminal activity exists. For those reasons, Officer Vaughn had a reasonable suspicion that Crick was involved in criminal activity, and Officer Vaughn did not violate Crick's Fourth Amendment rights when he detained Crick for the purposes of conducting an investigation related to a reasonable suspicion that Crick was involved in criminal activity.

Even if the lawfully initiated traffic stop terminated at the point at which Officer Vaughn told Crick that he would receive only a warning, the subsequently conducted dog sniff was a *de minimis* intrusion on Crick's Fourth Amendment rights. **See *United States v. Alexander***, 448 F.3d 1014, 1016 (8th Cir. 2006) (noting dog sniffs that occur within a

short time following the completion of a traffic stop are not constitutionally prohibited if they constitute only *de minimis* intrusions on the defendant's Fourth Amendment rights).

### D.   Dog Sniff

Crick questions the validity of an indication by a dog trained in the detection of narcotics, when the dog did not indicate on the initial sniff of the area, but then indicated after a second command to sniff the same area for the detection of narcotics. Assuming the "dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present." **United States v. Donnelly**, 475 F.3d 946, 955 (8th Cir. 2007). "To establish the dog's reliability, the affidavit need only state the dog has been trained and certified to detect drugs." **United States v. Sundby**, 186 F.3d 873, 876 (8th Cir. 1999).

Because the record clearly shows that Officer Vaughn and Ela were trained and certified by the State of Nebraska in the detection of narcotics, the courts finds that Ela is reliable in her detection of narcotics. Crick suggests that when Ela alerted for the second time on the driver's side rear wheel well of Crick's truck, and then indicated on the front driver side corner of Crick's trailer, Ela was not alerting and indicating to the odor of narcotics, but instead in response to the command given to Ela by Officer Vaughn. The government contends Officer Vaughn gave the second command to sniff for the odor of narcotics to clarify findings made as the result of the first command to sniff for the odor of narcotics. The court finds the government's position is correct. Officer Vaughn indicated that, to his knowledge, Ela had never made a mistake during his time with Ela. At the time the second command was given Ela had already alerted twice to the odor of narcotics, and based on those findings Officer Vaughn was within his authority to give a second command to clarify the original findings. Based upon Ela's indication, Officer Vaughn had probable cause to search the vehicle.

### E.   Search Conducted On The Trailer At The OPD Impound Lot

Crick argues police officers do not have legal justification to search a trailer without a warrant when a trailer is at an impound lot. An exception to the warrant requirement is

the automobile exception. ***United States v. Castenada***, 438 F.3d 891, 893 (8th Cir. 2006). "The warrantless search of a vehicle is constitutional pursuant to the 'automobile exception' to the warrant requirement, if law enforcement had probable cause to believe the vehicle contained contraband or other evidence of a crime before the search began." ***United States v. Wells***, 347 F.3d 280, 287 8th Cir. 2003).

The record easily supports the existence of probable cause. The relevant case law advises that once a dog indicates to the presences of narcotics on the outside of a vehicle, officers have probable cause to search the vehicle. ***$404,905.00,*** 182 F.3d at 647. In the case at bar, because Ela indicated to the presence of narcotics on the outside of Crick's trailer, Officer Vaughn had probable cause to search the vehicle. Even in the absence of Ela's indication, the totality of the circumstances would still support probable cause considering Crick's behavior, responses to questioning, and multiple alerts Ela made on the outside of Crick's truck and trailer.

The defendant argues the automobile exception does not give officers the right to remove a vehicle from the scene of a traffic stop and conduct a search at another place sometime into the future without a warrant. The Supreme Court has held, "[w]hen police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody." ***Michigan v. Thomas***, 458 U.S. 259, 261 (1982).

**IT IS RECOMMENDED TO JUDGE JOSEPH F. BATAILLON that:**
Crick's motion to suppress (Filing No. 10) be denied in all respects.

**ADMONITION**

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such

objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 2nd day of July, 2007.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge